## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:23cr182 |
| | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| PERNELL RIDDICK, | : | |
| Defendant | : | |

## MEMORANDUM

Before the court is Defendant Pernell Riddick's motion to suppress evidence. (Doc. 24). Riddick seeks to suppress physical evidence (illegal drugs and handguns) seized as the result of a traffic stop and subsequent search warrant. Following an evidentiary hearing and supplemental briefing by the parties, Riddick's motion is ripe for disposition.

**Factual Background[1]**

On July 11, 2023, a grand jury returned a two-count indictment against Riddick charging him with: 1) possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1); and 2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). (Doc.

---

[1] These background facts are derived from the indictment, (Doc. 1), and the testimony of Corporal Matthew Nero of the Pocono Mountain Regional Police Department during the suppression hearing on April 22, 2024, (Doc. 38, Hearing Transcript). The court will address Corporal Nero's testimony in greater detail in the analysis section of this memorandum.

1).  Count 1 of the indictment references defendant's two prior state-level

convictions for manufacture, delivery, or possession with intent to deliver a

controlled substance in violation of 35 PA. CONS. STAT. § 780-113(A)(30). (Id.)

The offenses charged in this case stem from a narcotics investigation by

the Pocono Mountain Regional Police Department ("PMRPD") using a

confidential informant. (Doc. 38, Hearing Transcript, ("H.T."), 04/22/24, M. Nero,

5:24-25, 12:11-24, 15:15-16:7).  The investigation ultimately led to a traffic stop

and search of a vehicle driven by Riddick on September 2, 2022, after the

informant decoyed Riddick and his passenger, Amanda Petrizzo, to a gas station

that PMRPD officers were surveilling. (Id. at 20:20-43:18).  Working with Corporal

Matthew Nero of PMRPD, the informant set up a purported purchase of a half-

pound of methamphetamine through contacts with Petrizzo. (Id. at 15:15-20:16).

The informant relayed specific information about Petrizzo, Petrizzo's alleged

supplier (Riddick), and Riddick's vehicle to officers, as well as the approximate

time for the encounter at the gas station.  (Id.)

After a vehicle matching the informant's description pulled into the gas

station at approximately the time expected, officers positively identified Petrizzo,

who had an active warrant for her arrest. (Id. at 21:19-22:11).  When the vehicle

departed the gas station (the purported purchaser did not exist), Corporal Nero

initiated a traffic stop. (Id. at 23:10-26:7).  The stop ended with Riddick being

2

placed into custody after a consent search uncovered drug paraphernalia and a canine sniff alerted Nero to the presence of a controlled substance in the vehicle. (Id. at 28:1-35:7).  After the canine alerted and Nero began a hand search, Riddick's calm demeanor changed, and he told Nero to end the search. (Id. at 35:8-36:7).  Nero and another officer then obtained a search warrant and the subsequent search resulted in the seizure of methamphetamine, cocaine, fentanyl, and two handguns from the vehicle. (Id. at 36:25-43:7)

On January 3, 2024, Riddick filed the instant motion to suppress.  (Doc. 24).  Defendant argues that PMRPD lacked any level of suspicion to initially stop the vehicle. (Doc. 25, Br. in Supp.)  He also contends that officers prolonged the stop without reasonable suspicion. (Id.) Consequently, Riddick argues that the officers infringed upon his Fourth Amendment rights and the seized physical evidence from the vehicle should be suppressed. (Id.)

After the Government filed an opposition brief, (Doc. 26), and defendant filed a reply, (Doc. 27), the court held an evidentiary hearing on April 22, 2024 where Corporal Nero testified.  The parties then filed post-hearing briefs citing Nero's testimony. (Docs. 38, 39).  This matter is now ripe for a decision.

**Legal Standard**

A defendant who seeks to suppress evidence from a claimed Fourth Amendment violation bears the initial burden of establishing a basis for his

3

motion. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). Once the defendant establishes a basis for his motion, the "burden shifts to the government to show that the search or seizure was reasonable." Id.; see also United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009)("the Fourth Amendment does not prohibit all searches—only those that are unreasonable.") (further citation omitted).  The government must then prove by a preponderance of the evidence that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005); see also United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974).  Evidence obtained from an unreasonable search must be suppressed as "fruit of the poisonous tree." United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006)(quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)(internal quotations omitted)).

**Analysis[2]**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on

---

[2] This section constitutes the court's findings of fact and conclusions of law.

probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir.

2002)(citing Katz v. United States, 389 U.S. 347, 356–57 (1967)).

"A well-established exception to the Fourth Amendment's warrant

requirement permits an officer to 'conduct a brief, investigatory stop when the

officer has a reasonable, articulable suspicion that criminal activity is afoot.' "

United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012) (quoting Illinois v.

Wardlow, 528 U.S. 119, 123 (2000)); see also Terry v. Ohio, 392 U.S. 1, 27, 30–

31 (1968)).  "[T]he Terry reasonable suspicion standard applies to routine traffic

stops." United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir.

2006)(discussing Whren v. United States, 517 U.S. 806, 810 (1996); United

States v. Arvizu, 534 U.S. 266, 273 (2002)).

Additionally, "a seizure lawful at its inception can nevertheless violate the

Fourth Amendment because its manner of execution unreasonably infringes

possessory interests protected by the Fourth Amendment's prohibition on

'unreasonable seizures.' " United States v. Jacobsen, 466 U.S. 109, 124 (1984).

In his motion to suppress evidence, Riddick challenges the initial legality of

the traffic stop and the extension of the stop.  The court will address these issues

seriatim.

5

### 1. The Legality of the Traffic Stop

Riddick takes the position that Corporal Nero lacked "any level of suspicion" to initiate the traffic stop.  (Doc. 25, Df. Br. in Supp., at p. 1).  The Government, however, has come forward with credible testimony from Corporal Nero establishing reasonable suspicion to make an investigatory traffic stop.

The law provides that a police officer is permitted "to initiate a brief investigative traffic stop when he has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Kansas v. Glover, 589 U.S. 376, 380, 140 S. Ct. 1183, 1187 (2020)(citing United States v. Cortez, 449 U.S. 411, 417–418 (1981)); Terry, 392 U.S. at 21–22). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." Glover, 589 U.S. at 380 (citing Navarette v. California, 572 U.S. 393, 397 (2014); United States v. Sokolow, 490 U.S. 1, 7 (1989)).  The reasonable suspicion standard: 1) is "less demanding" and "less stringent" than probable cause; 2) allows for an inquiry that "falls considerably short of 51% accuracy[;]" 3) rejects "a rigid structure on the concept of reasonableness[;]" and 4) can be based on an officer's "common sense as a source of evidence[.]" Glover, 589 U.S. at 380–84 (citations omitted).

6

Courts making reasonable-suspicion determinations must examine the "totality of the circumstances" of each case to analyze whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273 (2002)(citing Cortez, 449 U.S. at 417–418 (1981)).  For all seizures, the officer's action must be justified at its inception. See Glover, 589 U.S. at 386 (citations omitted).  "[T]he presence of additional facts might dispel reasonable suspicion." Id. (citing Terry, 392 U.S. at 28).  But reasonable suspicion derived from the cumulative effect of available information cannot be defeated by a plausible, innocent explanation for each arguably suspicious factor through a divide-and-conquer analysis. United States v. Stewart, 92 F.4th 461, 468 (citing District of Columbia v. Wesby, 583 U.S. 48, 62 (2018)).

To give the court a sense of "the whole picture," see Navarette, 572 U.S. at 397, the Government has advanced no less than four bases cumulatively articulating Corporal Nero's reasonable suspicion to stop Riddick's vehicle: 1) Nero's specialized training and expertise in investigating drug trafficking; 2) the specific information from the informant to Nero foretelling Riddick and Petrizzo's arrival at a certain place and time in a specific vehicle to ostensibly sell drugs; 3) Nero's knowledge of Petrizzo's previous drug activities and her outstanding

warrant; and 4) the Pennsylvania Vehicle Code violations observed by Nero and the other officers as Riddick's vehicle entered and exited the gas station.

### A. Corporal Nero's Experience and Training

In the reasonable suspicion calculus, officers can "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 418 (further citation omitted).

In this matter, Corporal Nero testified that he has served as a police officer with PMRPD since 2003 and with the Monroe County Drug Task Force since 2005. (Doc. 38, H.T. at 6:1-9).  As discussed further below, Nero has also been designated as a handler for a canine officer at the department. (Id.)  Nero testified that he has attended close to one thousand (1000) hours of narcotics-related training, including highway interdiction and surveillance. (Id. at 6:10-24). He has participated in over one thousand (1000) drug-related investigations and conducted surveillance of a suspected drug location hundreds of times. (Id. at 7:13-24).  Per Nero, he has used confidential informants and performed controlled purchases in drug investigations approximately one hundred (100) times. (Id. at 10:18-25).

8

### B. Information Provided by The Informant

Against the backdrop of Corporal Nero's training and experience, he and other PMRPD officers had been relying upon information from a confidential informant as part of ongoing narcotics investigations by the department. (Id. at 12:11-17). As discussed below, the informant led Riddick directly to Corporal Nero and the other officers through a controlled purchase operation without a real-life purchaser.

Under the law, information supplied by informants can serve as the basis for investigative stops so long as the tip "can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.' " See Navarette, 572 U.S. at 397 (2014)(quoting Alabama v. White, 496 U.S. 325, 327 (1990)); see also United States v. McCants, 952 F.3d 416, 422 (3d Cir. 2020). Informants used by the police need not be infallible and their reliability may be bolstered by accurate predictions. See Illinois v. Gates, 462 U.S. 213, 245–46 & n. 14 (1983); see also United States v. Nelson, 284 F.3d 472, 483 (3d Cir. 2002) ("In Gates, the Court recognized that when an informant has been shown to be right about some things, he is probably right about others, including the alleged criminal activity.")

The Third Circuit has identified five specific factors that indicate reliability for tips:

(1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation;

(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated;

(3) The content of the tip is not information that would be available to any observer;

(4) The person providing the information has recently witnessed the alleged criminal activity; and

(5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

McCants, 952 F.3d at 422 (formatting modified); United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (both citing United States v. Torres, 534 F.3d 207, 211 (3d Cir. 2008)).

"Though these factors all are relevant to [the] analysis, no single factor is dispositive or even necessary to render an informant's tip reliable," and the court must look again "to the totality of the circumstances to determine" if informant information had "sufficient indicia of reliability" in deciding whether an officer possessed "objectively reasonable suspicion" to justify the traffic stop. See Johnson, 592 F.3d at 449 (3d Cir. 2010)(citations omitted).

As for the first reliability factor, Corporal Nero initially obtained information from the informant face-to-face where he could observe that person's credibility. (Doc. 38, H.T. at 14:14:9-19). Nero testified that he met with the informant in

10

person in the parking lot of a closed restaurant along State Route 115 on September 1, 2022. (Doc. 38, H.T. at 15:15-20, 77:3-10). Per Nero, the informant initiated a call to Riddick's eventual passenger, Amanda Petrizzo; Nero was nearby and heard some of the conversation. (Id. at 15:21-16:7, 17:3-17, 71:6-10, 73:19-20). Nero testified that the entire purpose of the call was to facilitate an ostensible purchase of a half-pound of methamphetamine. (Id. at 17:17-20). Nero also testified that the informant previously provided reliable narcotics-related information to PMRPD which led to the arrests of other individuals. (Id. 14:20-15:10).

Regarding the second factor, Corporal Nero testified that he knew the informant from that person's arrest and from using the informant to gain information in other narcotics investigations.[3] (Id. at 13:13-14:14, 53:8-12, 60:3-17, 61:3-6). Nero explained that the informant was providing information/cooperation pending disposition of their own drug charges. (Id. at 67:8-19). Nero also testified that the informant could have been subject to criminal consequences if false information was provided. (Id. at 15:11-14). Although not explicit in Nero's testimony, it is not a great leap to expect that the

---

[3] Defendant argues that Corporal Nero testified inconsistently regarding the occasions where the informant provided information to law enforcement. (Doc. 41, Df. Supp. Br. in Supp. at 2). Nero's responses to cross-examination questions related to the informant do not gravely injure his overall credibility or provide grounds to invalidate his reasonable suspicion in this case.

11

informant would not obtain any benefit in the disposition of their own charges if that person provided the police with fabricated information.

As for the third factor, the informant also provided specific information that would not be available to any observer.  "A 'not truly anonymous' tip is accorded greater weight when 'the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not to the general public,' and 'the tip could not have been generated by the general public, nor based solely on observation.' " Brown, 448 F.3d at 249 (3d Cir. 2006)(quoting Nelson, 284 F.3d at 483).

Per Corporal Nero's testimony, the informant advised Nero that a half-pound of methamphetamine could be delivered to a set location through an associate known to Petrizzo. (Doc. 38, H.T. at 15:15-16:7).  With Nero present, the informant set up the purported purchase from that associate through Petrizzo. (Id. at 15:21-16:1, 18:7-9, 52:9-11).  The informant arranged the purchase quantity, buy location, and time in Nero's presence. (Id. at 16:1-7, 17:10-17, 74-6:14).  Authorities decided to use an "unwitting third party" to set up the purchase, meaning information was relayed by police through the informant to Petrizzo about a person who did not exist.  (Id. at 71:11-72:9, 73:21-25).

The informant advised Corporal Nero that Petrizzo would arrive with the drugs at a gas station on State Route 115, the same road where the informant

12

was meeting with Nero. (Id. at 16:1-7, 17:10-12).  According to Nero, the gas station was a "known location" with "prior drug-related offenses" and officers patrolled that location regularly. (Id. at 18:18-21).  The informant advised that Petrizzo and an associate would arrive in a Nissan Rogue, silver or champagne in color. (Id. at 15:21-16:7, 20:10-16, 96:12-14).  Per Nero, Petrizzo's associate was not identified by name but described as a "light skinned Hispanic male. . . clean cut, and good looking." (Id. at 16:25-17:4). The informant also relayed that the Nissan had a "very good hiding spot" inside the vehicle. (Id. at 22:24-23:6, 74:20-23).

The fourth factor considers whether the person recently witnessed the alleged criminal activity.  The above testimony indicates that the informant was closely involved with Petrizzo's criminal activity or was at least intimately familiar with details about Petrizzo and her associate's criminal activity.  Of the convictions secured by the informant's cooperation, one of the individuals was Petrizzo. (Id. at 95:12-20, 103:14-19).

The third and fifth reliability factors overlap somewhat.  The fifth factor assesses predictiveness and the ability to test the informant's knowledge or credibility, i.e., corroboration.  As stated above, the information provided by the informant included remarkable prognostication: a specific vehicle carrying

13

specific occupants would arrive at a specific location on a specific day at a specific time and for a specific purpose.[4]

A substantial amount of information provided by the informant was then corroborated by the surveillance operation. As Corporal Nero testified, after receiving word from the informant that the informant-arranged purchase would occur within the hour, PMRPD officers rushed to stakeout the gas station. (Id. at 20:17-23). Nero and another detective positioned themselves down the road from the gas station in separate vehicles. (Id. at 20:24-21:1, 21:5-8). Another officer, Detective Bray, parked at the gas station in an unmarked vehicle. (Id. at 21:5-8). Communicating through conference-call software, Detective Bray then advised Corporal Nero that, as predicted, a Nissan Rogue matching the informant's description pulled into the gas station parking lot after 11:00 AM. (Id.

---

[4] Nero and the informant scheduled the ostensible purchase for September 1, 2022, but the plan fell apart due to an issue with Petrizzo not answering her phone. (Doc. 38 at 19:5-16, 77:16-78:1). The next day, September 2, 2022, Nero contacted the informant for an update. (Id. at 19:20-23). The informant called Nero back and advised him that the purported purchase was back on at the gas station for 11:00 AM as previously negotiated. (Id. at 19:20-20:18, 78:2-19).

The fact that the informant-negotiated operation fell apart on September 1, 2022 does not cast doubt on Corporal Nero's articulation of reasonable suspicion. Nero explained that Petrizzo was a known drug user and that drug investigations are ever evolving. (Id. at 19:9-16, 97:14-98:5). The court is not assessing the reliability of Petrizzo as a broker of illegal drugs; rather, the testimony indicates that the informant provided reliable face-to-face information to Corporal Nero in his presence and then both Nero and the informant persisted to ensure that the arranged deal did not completely fall through. The information provided by telephone on September 2, 2022 was merely a continuation of the information that was relayed to Nero face-to-face on the previous day.

at 21:18-24, 96:12-97:1, 97:7-12).  Detective Bray identified Petrizzo in the parking lot and noted that an individual matching the informant's description of Petrizzo's associate was driving the vehicle. (Id. at 22:12-17, 80:8-10).

Based on a totality of the circumstances, the informant's highly predictive tip, bolstered by surveillance, was sufficiently reliable to provide Corporal Nero and the other officers with reasonable suspicion to stop Riddick's vehicle.

### C. The Presence of Petrizzo in the Vehicle

There are additional facts to consider in the totality of circumstances analysis.  Although she is not charged with a federal offense, the officers in this case were familiar with Petrizzo, as Corporal Nero testified.  She had been involved in the illegal narcotics trade and arrested by PMRPD and other agencies in Monroe County, Pennsylvania for drug offenses. (Id. at 16:8-16, 98-17-20). Per Nero, as the informant-arranged deal was developing, another detective performed a criminal record check of Petrizzo and determined that she had an extensive drug history and an active warrant through the Pennsylvania State Police for retail theft. (Id. at 18:22:19:5, 80:15-24).  Once officers discovered the warrant, they had an obligation to arrest Petrizzo. See Utah v. Strieff, 579 U.S. 232, 240 (2016) (citing United States v. Leon, 468 U.S. 897, 920, n. 21 (1984)("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions."))(internal quotation

marks omitted).  Upon stopping the vehicle, officers arrested Petrizzo. (Doc. 38,
H.T. at 26:18-27).  Accordingly, Nero's testimony about his knowledge of Petrizzo
and her outstanding warrant provided Nero with more facts establishing
reasonable suspicion to stop Riddick's vehicle after she was identified as
Riddick's passenger by Detective Bray at the gas station.

### D. Vehicle Code Violations

Detective Bray also communicated from the gas station that the Nissan
Rogue had illegally tinted windows. (Id. at 21:23-22:1, 22:18-23).  The vehicle
stayed at the gas station for several minutes. (Id. at 23:10-14).  When the
fictitious drug-buyer did not materialize, the vehicle left the gas station. (Id.)
Corporal Nero then initiated the traffic stop. (Id. 23:18-20).  He called out the
plate number on the radio and received information that the vehicle was
registered to Riddick and that the Nissan's registration was expired. (Id. at 23:21-
24:1).  Corporal Nero activated his lights and sirens. (Id. at 24:22-24).  He
observed Riddick slow down to almost a stop, turn the vehicle toward the
oncoming traffic lane, and make movements inside in the direction of the center
console. (Id. at 24:22-25:7). Although the vehicle had tinted windows, Nero
testified it was a sunny morning and he observed Riddick's gestures in the
shadows through the Nissan's back window. (Id. at 24:9-14, 25:6-7).  Riddick
then pulled the vehicle over onto a side road. (Id. at 26:2-7).

In his arguments in support of suppression and at the suppression hearing, Riddick challenged statements by Corporal Nero that the tint of Riddick's windows violated state vehicle laws and regulations.[5]  He concedes, however, that the vehicle was unregistered.[6]  "[A]ny technical violation of a traffic code legitimizes a stop," however, "**even if the stop is merely pretext** for an investigation of some other crime." Mosley, 454 F.3d at 252 (citing Whren, 517 U.S. 806(emphasis added).  Moreover, "an officer need not be factually accurate in [his] belief that a traffic law had been violated but, instead, need only produce facts establishing that [ ]he reasonably believed that a violation had taken place." Delfin-Colina, 464 F.3d at 398.  Whether or not the windows of the Nissan were actually too dark is not the question to resolve here.  Rather, the motor vehicle violations justify Nero stopping Riddick's vehicle.

---

[5] Pennsylvania's Vehicle Code prohibits sun screening materials which do not permit a person to see through the side windows of vehicles. See 75 PA. CONS. STAT. § 4524(e)(1).  Similarly, the Vehicle Code makes it unlawful to drive an unregistered vehicle. 75 PA. CONS. STAT. § 1301(a).

[6] At the time of the suppression hearing, Riddick dropped arguments raised in his briefs that his vehicle was properly registered at the time of the traffic stop. (Doc. 38, H.T. at 4:5-21).

17

## 2. The Length of the Traffic Stop

Riddick also challenges the extension of the traffic stop beyond investigation of the Vehicle Code violations.[7] (Doc. 25, Br. in Supp. at p. 2).  As discussed above, the clear mission of the traffic stop was to look for contraband (illegal drugs) and the Vehicle Code violations gave the officers solid ground to make the stop.  Furthermore, in his testimony, Corporal Nero particularized cascading facts to justify reasonable suspicion once the stop began so as to continue with a drug-related investigation without constitutional injury to Riddick.

"Like a <u>Terry</u> stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'. . ." <u>Rodriguez v. United States</u>, 575 U.S. 348, 354 (2015) (citations omitted). "Authority for the seizure [] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." <u>Id.</u> "An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes." <u>United States v. Green</u>, 897 F.3d 173, 179 (3d Cir. 2018). The point when a traffic stop is extended by officer diversion is commonly referred to as a "<u>Rodriguez</u> moment." <u>Green</u>, 897 F.3d at 179; <u>United States v. Garner</u>, 961 F.3d 264, 270-71 (3d Cir. 2020).

---

[7] Riddick raised this argument in his initial briefing. It appears, however, that Riddick has retreated from this position based on his post-hearing submission. (Doc. 41, Df. Br. in Supp. at 8 & n.4).

The Rodriguez inquiry proceeds in two steps. Stewart, 92 F.4th at 467 (citing United States v. Hurtt, 31 F.4th 152, 159 (3d Cir. 2022)). First, the court determines the Rodriguez moment, i.e., when the stop was measurably extended. Id. (citing Green, 897 F.3d at 179). Second, the court determines "whether the facts available to the officer up to that moment established reasonable suspicion of criminal activity." Id. "The extension of the traffic stop is lawful only if, at the time of the extension, the officer already had reasonable suspicion." Id. (citing Garner, 961 F.3d at 271).

As Corporal Nero testified, the mission of the stop went beyond traffic infractions. (Doc. 38, H.T. at 84:1-22).  The continued search in this case was thus justified by more than the observed Vehicle Code violations but reasonable suspicion of other criminal activity developed prior to and after the stop. Consequently, there is no Rodriguez moment to determine. See 575 U.S. at 350, 354; see also Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").

At the time Riddick's vehicle was pulled over, the totality of circumstances supported Nero's reasonable suspicion to believe Riddick and Petrizzo were trafficking at least a half-pound of methamphetamine using a "very good hiding spot" inside the vehicle. The only question that requires further analysis is whether the facts show there was truly reasonable suspicion, largely addressed

19

above.  The events following the traffic stop itself, however, only served to further

Nero's suspicions.  And nothing in the details of the search following the stop

amounts to a constitutional violation.

As Nero testified, he first approached the passenger side to confirm

Petrizzo's identification. (Doc. 38, H.T. at 26:18-21).  He arrested her on the

outstanding warrant and provided Miranda warnings. (Id. at 27:5-10).  Per Nero,

she then told officers that she did not know the driver, but they were headed to a

park to "hang out." (Id. at 27:10-15).  Nero recognized this as obfuscation. (Id.)

Nero then joined another officer to address Riddick, confirming his

identification and ownership of the vehicle. (Id. at 28:1-11).  Nero directed

Riddick to step out of the Nissan and escorted him to the front of the canine

vehicle. (Id. at 29:7-14).  Importantly, Riddick then granted officers consent to

search the Nissan.[8] (Id. at 30:8-15).  Nero testified that he requested consent

from Riddick while wearing clothing that clearly identified him as a canine officer

and while the police dog, Creed, was barking. (Id. at 30:18-23, 31:4-16).

Accordingly, Nero's interactions with Riddick were lawful because his actions up

to and after that point were lawful. See United States v. Kithcart, 218 F.3d 213,

219 (3d Cir. 2000)("[A] police officer can, as a matter of course, order the driver . .

---

[8] Riddick does not challenge his consent to the search of the vehicle in this matter. One well-established exception to the requirements of both a warrant and probable cause is search that is conducted pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

.and the passengers. . .out of a lawfully stopped car.")(citations omitted); United States v. White, 80 F.App'x 230, 231 (3d Cir. 2003)("In simple terms, an officer certainly may ask—incident to a lawful traffic stop—for consent to search based on a hunch, or indeed, on nothing at all.")(discussing Whren, supra).

Once Riddick consented to the vehicle search, Corporal Nero then began the search of the vehicle with Creed. (Doc. 38, H.T. at 32:12-16).  During his testimony, Nero explained that Creed is certified yearly as a drug interdiction canine and has had thousands of hours of training since 2017. (Id. at 9:3-23). Per Nero, Creed has been trained to detect and alert to methamphetamine, crack cocaine, heroin, and marijuana. (Id. at 10:15-17).  He testified that Creed alerts in a "passive" manner: when Creed detects a controlled substance, he sits instead of scratching. (Id. at 10:7-12, 63:24-64:11).  Within ten (10) to thirty (30) seconds of the search, Creed began alerting in the general area of the center console. (Id. at 33:6-9, 41:23-42:9).  Nero placed Creed back into his vehicle and began to verify Creed's alerts and signals. (Id. at 33:13:18).  He located a black backpack containing a razor blade that appeared to have white residue on it along with sandwich baggies in the glove compartment, each a tool of the drug trade, per Nero's testimony. (Id. at 33:15-34:23).

While Corporal Nero was searching, Riddick was speaking with another officer, Detective Van Note. (Id. at 35:8-17).  At some point after discovery of the

backpack, Riddick's demeanor changed. (Id. at 35:5-25).  Van Note pulled Nero into a conversation with Riddick. (Id. at 35:17-25). Corporal Nero believed Riddick was trying to get him away from the vehicle. (Id.)  Riddick then revoked his consent. (Id.).  Accordingly, Nero stopped the search and applied for a search warrant, which officers then obtained. (Id. at 36:10-17).  A subsequent warrant-supported search revealed a trap compartment in the center console of Riddick's vehicle in the area where Creed alerted, which, when pried open, revealed firearms and a "large amount of narcotics." (Id. at 37:24-25, 39:1-6, 42:2-9, 43:4-7).

Upon consideration of Corporal Nero's testimony during the suppression hearing, his conduct following the traffic stop was supported, for Fourth Amendment purposes, by both sufficient reasonable suspicion and Riddick's consent.  Accordingly, the motion to suppress will be denied.

## Conclusion

For the reasons set forth above, the defendant's motion to suppress is denied and this matter will be set for trial by an appropriate order.

Date: 5/31/24

JUDGE JULIA K. MUNLEY
United States District Court